Home Builders Lumber Company v. Commissioner.
Home Builders Lumber Co. v. Commissioner
Docket No. 7205.
United States Tax Court
1946 Tax Ct. Memo LEXIS 18; 5 T.C.M. (CCH) 1054; T.C.M. (RIA) 46282; December 9, 1946
R. N. Gresham, Esq., 1603 Alamo Antional Bldg., San Antonio 5, Texas, for the petitioner. Donald Abbey, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: This proceeding is for a redetermination of deficiencies declared in petitioner corporation's income and excess profits taxes for the calendar year 1941, together with a penalty thereon in the following amounts: 25% penalty
Income Tax
$4,836.63
Declared Value Excess-Profits Tax
3,332.47
Excess Profits Tax
1,817.00
$454.25
Three questions *19 are presented: (1) Is unreported profit of $24,189.87 in installment obligations, on which the tax was deferred, taxable in 1941 when said obligations were disposed of at a forced sale, although petitioner was insolvent both before and after such sale? (2) Is petitioner entitled to deduct the sum of $6,000 as a bad debt? (3) Is the 25% penalty for failure to file an excess-profits tax return for 1941 properly imposed? From the stipulation, to which reference is made, the evidence and exhibits, the following findings of fact are made. Findings of Fact Petitioner is a corporation organized August 1, 1923, under the laws of the State of Texas, with its principal office in San Antonio, Texas. From its organization and including the taxable year, it was engaged in the business of selling real estate and the improvements thereon. It filed its income tax returns on the accrual basis, but elected to report its income from conditional and installment sales of real estate on the installment basis. Its return for the taxable year involved was filed with the collector of internal revenue for the first district of Texas. When the corporation was organized T. E. Barnes and Isaac Bledsoe *20 each subscribed $12,500 to the corporation capital for which Barnes received 49 percent of the stock, Bledsoe received 50 percent and 1 percent was issued as qualifying shares. Neither Bledsoe nor Barnes actually paid any money into the corporation but in 1925 the corporate accounts representing accrued interest were manipulated in such a way that the $12,500 capital subscribed for by Bledsoe and Barnes was cancelled but Bledsoe never reported this income or paid any tax thereon. In 1924 Isaac Bledsoe loaned T. E. Barnes individually $6,000 on a personal note secured by 60 shares of petitioner's capital stock. T. E. Barnes, the maker of the note, was not personally liable for payment, and the note further provided that in the event of default the collateral stock was to be taken by the holder of the note. In 1927, Bledsoe transferred the note and collateral to petitioner for $6,000 in cash. In 1936 petitioner claimed a bad debt deduction of $6,000 on Barnes' note which was disallowed by the Commissioner on the ground of prior worthlessness. Barnes severed his connection with the corporation in 1932 and from then on Bledsoe had absolute control of the corporation and was to all *21 purposes the sole owner. The corporation did not have offices of its own but functioned in the offices occupied by Bledsoe who operated an independent real estate business and a corporation known as the San Antonio Music Company, which he owned. The same personnel was used to carry on the business of all three concerns which were owned by Bledsoe. Petitioner had no employees of its own. Its books were kept and its accounts were collected by employees of the Music Company, and the bookkeeper was paid by the Music Company. Petitioner paid Bledsoe 7 percent for the collection of rentals which were made by the Music Company. The Music Company charged Bledsoe for its services. After the tax deduction was refused in 1936 the claimed indebtedness of $6,000 was never reinstated on petitioner's books and by 1941 the stock certificates which had secured the note had disappeared and no evidence was introduced as to its whereabouts. In 1936 the petitioner's books showed a deficit of $35,651.01. The Barnes note for $6,000 went into default in 1924 and became worthless prior to the taxable year 1941. From the organization of the corporation Bledsoe made advances to it for land and the construction *22 of buildings. He was primarily interested in financing the corporation as a long-term operator, i.e., he would rather sell for a small down payment for a long term at a high price. Houses were sold on down payments as low as $25 and payments of $25 a month. Properties sold were frequently repossessed and it was nothing unusual for purchasers to stay from two to six months and then walk off the premises. The result was a resale. On April 30, 1935, petitioner in return for claimed advancements from Bledsoe to petitioner and accumulated interest, executed its note dated December 31, 1934, in the sum of $66,027.51, payable to Isaac Bledsoe and secured by a deed of trust, under which the trustees were authorized in case of default to sell the property involved at public sale without foreclosure proceedings. This deed of trust was a lien on all of petitioner's assets, including the installment sales contracts, (except three, the unrealized profits of which totalled $868.20), installment notes and real estate, except miscellaneous assets amounting to $2,408.27. The note, which purported to be an account stated, provided for semiannual interest at the rate of 8 percent with interest at 1 *23 percent on past due interest payments. There was included in the note as unpaid interest to Bledsoe the amount of $13,800. In the operation of petitioner by Bledsoe and his organization, money for commissions, interest, etc., was paid to Bledsoe as it was received by the petitioner for the years 1932 to 1935. Payments including interest were made to Bledsoe as follows: November 25, 1932
$ 8,139.45
December 31, 1934
14,608.78
December 31, 1935
5,656.65
From 1931 to 1941, inclusive, petitioner sold various tracts of real estate on conditional sales contracts and reported the profit thereon on the installment basis. On December 1, 1941, the unrealized profits on these sales amounted to $30,274.16. Of this amount $29,405.96 represented unrealized profits on installment sales contracts which were held as security on the note of $66,027.51 of which the Commissioner determined $22,908.34 constituted net gain on disposition of installment obligations includible in income. On December 22, 1938, Bledsoe transferred the Home Builders Lumber Co. note to the Bledsoe-Campbell-Clark trust. Bledsoe controlled this trust, the other shareholders being his wife, his *24 sister and his stepdaughter. The transfer was revocable. The note was held on December 2, 1941, by the trustees of the Bledsoe-Campbell-Clark Trust. On December 2, 1941, payments on the note being in default, all of the property covered by the deed of trust, having been appraised at $50,000, was sold at public sale for the sum of $50,000 to the trustees, who held the note. The bid price was paid by crediting $50,000 on the note. On the date of the sale accumulated interest had increased the note value from $66,027.51 to $92,954.43, which, after crediting the $50,000, left a balance still owing by petitioner on its note of $42,954.43. On December 1, 1941, just prior to the sale, the balance sheet of petitioner showed a deficit of $63,451.74. Included in the liabilities was the Bledsoe note including interest thereon in the total amount of $89,942.89. On December 2, 1941, after the sale petitioner's balance sheet showed a deficit of $38,402.82. It then possessed assets of the value of $2,408.27. Petitioner's income, deductions, net income or loss and income taxes paid for the years 1936 to 1940 were as follows: Net Income
Income Tax
Year
Gross Income
Deductions
or (Loss)
Paid
1936
$13,660.88
$13,619.39
$ 41.49
$ 3.32
1937
5,223.53
5,204.77
18.76
2.71
1938
3,479.55
4,146.76
(667.21)
None
1939
3,521.27
3,660.56
(139.29)
None
1940
5,763.47
5,647.38
116.09
17.24
*25 For 1941, the year involved, petitioner had gross income of $6,097.91 and claimed deductions in the amount of $9,761.47. Included in the claimed deductions was the $6,000 Barnes Note which was disallowed by the Commissioner. The gross income of $6,097.91 did not include the profit of $24,189.87 alleged by the respondent to have accrued on the foreclosure sale. The petitioner did not report as taxable income for the taxable year the unrealized gain from its installment sales contracts and installment note contracts which were sold at the forclosure sale in the amount of $22,908.34 nor did it report the amount of $1,281.53 representing accrued property taxes assumed by the purchaser, a total of $24,189.74. Opinion The Commissioner determined that petitioner had a gain on the disposition of installment obligations in 1941 in the amount of $22,908.34. In computing the deficiency this amount was increased to $24,189.87 by adding thereto $1,218.53 representing accrued property taxes assumed by the purchaser of the real and personal properties at the foreclosure sale. It is the respondent's contention that the unreported profits on installment obligations on which the tax was deferred *26 were taxable under section 44 (d) of the Internal Revenue Code[1] when the installment obligations were disposed of in 1941. He does not contend that the petitioner made a profit in 1941 by the sale at foreclosure of installment obligations, nor does he consider the petitioner realized income from "paper" profits resulting from the reduction of its indebtedness. He argues that Bledsoe really owned the petitioner after Barnes withdrew in 1932, the 60 shares of petitioner's stock having been transferred to petitioner as collateral on Barnes' note which Bledsoe had sold to petitioner in 1937; that Bledsoe manipulated the "loans" on his own terms; that Bledsoe controlled the Bledsoe-Campbell-Clark Trust to which the petitioner's note had been revocably transferred by him., that Bledsoe brought about the foreclosure of the deed of trust and the sale of the pledged assets in 1941 and that the entire plan, from start to finish, of disposing of the installment contracts on which there was $29,405.96 of unreported deferred income was Bledsoe's and, if regarded in their true light, the loans should be considered contributions to capital. He urges that in any event Bledsoe's *27 unpaid stock subscriptions of $12,500 with the interest which he charged on that amount should be deducted. Respondent further contends that the $6,000 note was worthless prior to the taxable year. *28 The petitioner contends that it was insolvent both before and after the foreclosure sale and therefore realized no taxable profit from the disposition of its installment contracts. It further contends that the $6,000 is deductible in 1941. To sustain its first contention petitioner relies on Texas Gas Distributing Company (1941), 3 T.C. 57, and related cases, and the rule announced therein that "where an insolvent debtor turns over all or part of his property to his creditors in full or partial satisfaction of his debts, if the debtor remains insolvent, he realizes no taxable gain." The Texas Gas case is distinguishable from the instant case on the very facts which determine the issue here and in no case upon which that decision rested do we find comparable facts. In the opinion in that case the Court pointed out at page 61 that "there was no accumulation of profit in past years or any other such intervening factor indicating a gain on which the collection of tax had been deferred." Here we have a profit on a sale made in prior years and on which the payment of tax had been deferred until the payment or other disposition of the obligation. *29 Our question here is the direct result of this "intervening factor" which was not present in the Texas Gas case. Moreover, in that case the creditor was a third party not connected with the taxpayer's business and the question involved was whether the petitioner realized income from the transfer of its entire assets to its creditor in extinguishment of its obligations, when the fair market value of its assets was less than the face value of the obligations. Here there was no forgiveness of indebtedness. The sale price of the assets was merely credited against the note while the balance of the debt remained, and the petitioner retained its corporate existence. It is obvious, therefore, that Texas Gas Distributing Company, supra, and similar cases bottomed on the cancellation or forgiveness of indebtedness are not controlling here. Cf. Dallas Transfer & Terminal Warehouse Co. v. Commissioner, 70 Fed. (2d) 95; Highland Farms Corporation, 42 B.T.A. 1314; Springfield Industrial Building Co., 38 B.T.A. 1445; Lakeland Grocery Company, 36 B.T.A. 289. But even if the case at bar did involve the cancellation or forgiveness *30 of indebtedness within the rationale of Texas Gas Distributing Company, supra, the contention of petitioner could not be sustained for the reason that the evidence before us does not convince us of the reality of the claimed indebtedness of $92,954.43. It is true that there is some evidence that Bledsoe made advances to petitioner, both before and after the execution of the note in the sum of $66,027.51. But just what these advances were; when and in what amounts they were made; the payments thereon of both principal and interest and the credits given, are facts not in the record. It appears from the evidence that the amount of $92,954.43 was composed of the balance on the note, $61,514.09, and accumulated interest. But the testimony indicates that it also contained advances. It further appears that there was included in the note of December 31, 1934, unpaid interest in the sum of $13,000. But apparently accrued interest in the sum of $25,000 which was set up on the books in 1925 to take care of the stock subscriptions of Barnes and Bledsoe in the amount of $12,500 each was not considered in the account stated in arriving at a total of $66,027.51. Moreover, payments, *31 including interest, were made to Bledsoe on November 25, 1932, and December 31, 1934, in the total amount of $22,748.23 and ondecember 31, 1935, interest was paid to him in the sum of $5,656.65. It further appears from the evidence that Bledsoe did not report for income tax purposes the $12,500 credited to his stock subscription, and there is nothing in the record to show that Barnes reimbursed the interest account for the $12,500 representing his subscription. Obviously interest in sums totalling $25,000 could not be accrued in 1925 and paid over to Barnes and Bledsoe and at the same time charged on the account stated in 1934. The respondent contends that the stock subscriptions were not considered in making up the total of the note for $66,027.51 and the petitioner has failed to prove that they were. Transactions between a corporation and its sole stockholder which have far reaching income tax consequences, should be closely scrutinized. Cf. Higgins v. Smith, 308 U.S. 473, and where, as here, they purport to result in the insolvency of the corporation all the facts establishing such transactions should be put in evidence, if such insolvency would result in relieving *32 the corporation from tax. The petitioner has failed to convince us of the reality of the insolvency which he urges. Moreover, we cannot lose sight of the fact that Bledsoe, who owned petitioner, operated it as a branch of his business; that it had no employees except the employees of Bledsoe; that Bledsoe took as commissions substantially all of its profits as collections were made and operated the business by making advancements, purported to be loans, at 8 percent interest which was compounded at 10 percent. Such "loans" have more the character of capital contributions than bona fide business loans. We hold that the unreported profits on the installment obligations, on which tax was deferred, were taxable under section 44 (d) of the Internal Revenue Code, when such obligations were disposed of at a force sale in 1941. The second issue involves the deduction of $6,000, representing a note given to Bledsoe by Barnes in 1924. The note was secured by 60 shares of petitioner's capital stock and the maker of the note was not liable for payment. The note went into default in 1924 and in 1927 Bledsoe transferred the note and the collateral to the petitioner. Obviously *33 all the parties understood that the note would not be paid and Bledsoe who was in control of the petitioner took this method of retiring the 60 shares of petitioner's stock. The Commissioner determined that it did not become worthless in the taxable year. We agree with this determination. The petitioner has failed to show that it had any value after 1927, aside from the 60 shares of stock and it is not clear what became of the stock. The Commissioner's determination is sustained as to this issue. The final issue involves the asserted penalty of 25 percent for failure to file an excess-profits tax return for 1941. Section 291 of the Internal Revenue Code provides for the imposition of such a penalty unless it is shown that such failure is due to reasonable cause and not from willful neglect. Since the respondent determined a penalty to be due within the time prescribed by law and the petitioner has failed to show that its failure to file an excess-profits tax return for 1941 was due to reasonable cause, it follows that the penalty is properly imposed. Decision will be entered under Rule 50. Footnotes
1. SEC. 44. INSTALLMENT BASIS. * * *
(d) Gain or Loss upon Disposition of Installment Obligations. - If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and (1) in the case of satisfaction at other than face value or a sale or exchange - the amount realized, or (2) in case of a distribution, transmission, or disposition otherwise than by sale or exchange - the fair market value of the obligation at the time of such distribution, transmission, or disposition. Any gain or loss resulting shall be considered as resulting from the sale or exchange of the property in respect of which the installment obligation was received. The basis of the obligation shall be the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full. This subsection shall not apply to the transmission at death of installment obligations if there is filed with the Commissioner, at such time as he may be regulation prescribe, a bond in such amount and with such sureties as he may deem necessary, conditioned upon the return as income, by the person receiving any payment on such obligations, of the same proportion of such payment as would be returnable as income by the decedent if he had lived and had received such payment. If an installment obligation is distributed by one corporation to another corporation in the course of a liquidation, and under section 112 (b) (6)↩ no gain or loss with respect to the receipt of such obligation is recognized in the case of the recipient corporation, then no gain or loss with respect to the distribution of such obligation shall be recognized in the case of the distributing corporation.